The **PARENT ASSOCIATION OF P.S. # 50, Channell Ellison, a minor by her parent and next friend Jacqueline Ellison, Ceressia Hathorn, a minor by her mother and next friend Ethel Hathorn, Sheniqua Dean, a minor by her mother and next friend Lillie Dean, individually and for others similarly situated, Plaintiffs,**

**v.**

**QUEENS, NEW YORK COMMUNITY SCHOOL DISTRICT # 28, Frankie L. Carr, Lynn J. Gross, Ann Hill, Judith Marcerino, Rita Siegel, Phoebe Wiener, Queens, New York Community School Board # 28 members (sued in their normal capacity), Doctor Arnold Raisner, Queens, New York Community School District # 28 Superintendent, Nathan Quinones, Chancellor of the City School District of the City of New York, Defendants.**

No. 84C2594.

United States District Court,
E.D. New York.

Jan. 15, 1986.

James I. Meyerson (Jonathan C. Moore, of counsel), New York City, for plaintiffs.

Frederick A.O. Schwarz, Jr., Corp. Counsel of the City of N.Y. (Elizabeth J. Logan, Beth Schwartz, Asst. Corp. Counsels, of counsel), New York City, for defendants.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

This is a class action brought by, among others, plaintiffs The Parent Association of Queens Public School # 50 in Community School District # 28 (District 28), and Ceressia Hathorn, a black minor child, who attends the public schools in District 28.

The defendants are District 28, the members of the board of District 28 (District 28 Board), the superintendent of District of 28 (the Superintendent), and the Chancellor of the New York City School District (the Chancellor).

By memorandum and order dated November 16, 1984 this court allowed the action to proceed as a Rule 23(b)(2) class action and conditionally certified the class as consisting of all black and Hispanic students who would have attended Junior High School # 142 (School 142) but for its closure.

Plaintiffs claim that (a) the act of closing School 142 and (b) the wholesale reassignment of the students to Junior High School 8 (School 8) were racially discriminatory acts. Plaintiffs allege jurisdiction of this court pursuant to 28 U.S.C. §§ 1343(3) and (4), 42 U.S.C. §§ 1981 and 1983, and the Thirteenth and Fourteenth Amendments to the United States Constitution. They also invoke the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

## I

In substance, plaintiffs contend that, commencing at least as early as 1970, defendants took actions and failed to act knowing that as a consequence School 142 would continuously and inevitably deteriorate and would ultimately have to be closed as a school for the general public. Plaintiffs assert that because blacks attended the school and it was in a black neighborhood defendants "planned and created" the "death" of the school pursuant to an "evolving policy" going back to at least 1970 and that their acts were thus in violation of the Equal Protection Clause and the Thirteenth and Fourteenth Amendments.

## II

School 142 opened as a junior high school in 1930, and closed to the general education population at the end of the 1983–1984 academic year. Thereafter a so-called career development center under the New York City Division of Special Education, Office of Citywide Programs, serving students with handicapping conditions, has occupied the building (now known as School 752).

When School 142 closed, the students continuing on in junior high school were assigned, with exceptions not here relevant, to attend School 8. Students graduating from the sixth grade at public schools 50 and 60 who would have attended School 142 for the seventh grade, now attend, with exceptions not pertinent, School 8.

The following tables show the capacity and register of and the percentage of uti-

lization of space at School 142 for the years 1970 through 1983.

| Year | Capacity | Register | Percentage of Utilization |
|------|----------|----------|---------------------------|
| 1970 | 1397 | 1285 | 92 |
| 1971 | 1425 | 964 | 67 |
| 1972 | 1425 | 1017 | 71 |
| 1973 | 1445 | 1017 | 74 |
| 1974 | 1445 | 1013 | 70 |
| 1975 | 1445 | 878 | 61 |
| 1976 | 1445 | 723 | 50 |
| 1977 | 1445 | 685 | 47 |
| 1978 | 1445 | 602 | 42 |
| 1979 | 1393 | 602 | 43 |
| 1980 | 1409 | 534 | 38 |
| 1981 | 1375 | 500 | 36 |
| 1982 | 1304 | 493 | 38 |
| 1983 | 1215 | 520 | 43 |

By 1984 enrollment at School 142 dropped to 319.

Throughout those years the students attending School 142 were between 91.1% and 96.1% black, with the balance largely Hispanic.

For the years 1970 through 1984 the students attending School 8 have been more than 95% black, with the balance largely Hispanic.

The following tables indicate the capacity and register of and the percentage of utilization of space at School 8 for the years 1970 through 1983.

| Year | Capacity | Register | Percentage of Utilization |
|------|----------|----------|---------------------------|
| 1970 | 1505 | 1710 | 114 |
| 1971 | 1540 | 1583 | 100 |
| 1972 | 1560 | 1378 | 88 |
| 1973 | 1560 | 1246 | 80 |
| 1974 | 1553 | 1192 | 77 |
| 1975 | 1553 | 1155 | 74 |
| 1976 | 1587 | 1083 | 68 |
| 1977 | 1577 | 977 | 62 |
| 1978 | 1522 | 980 | 64 |
| 1979 | 1615 | 827 | 51 |
| 1980 | 1606 | 751 | 47 |
| 1981 | 1554 | 760 | 49 |
| 1982 | 1547 | 723 | 47 |
| 1983 | 1539 | 663 | 43 |

By 1984 School 142 had become an underutilized facility and consequently had an academic program far less comprehensive than it had been between 1970 and 1974.

As plaintiffs state, this condition of underpopulation had the "natural and inevitable consequence" of causing the closing of a school no longer "a viable educational institution." Plaintiffs' contentions focus not so much on the immediate decision to close the school but on what they say were deliberate acts commencing at least fourteen years before that were "intentionally racially discriminatory and otherwise based on racial criteria" and led inexorably to the closing.

### III

Plaintiffs argue that defendants took the following affirmative and intentionally racially discriminatory actions: (1) the building of new junior high schools and the rezonings of students out of School 142 commencing about 1970, (2) the allowance of a free choice transfer program permitting elementary school students to choose to go to a school other than the one in their neighborhood in order to obtain an integrated education, (3) the allowance of special variances to students at School 142, (4) the allowance to School 142 students in 1979 of the option to obtain in another school "special progress" classes not available at School 142, and (5) the encouragement through guidance counselors of parents to have their children apply to go to "better schools."

Plaintiffs also contend that defendants failed to implement alternatives that would have increased enrollment of School 142 or otherwise improved it. They say defendants (1) failed to support and in the end opposed a proposal by District 27 to rezone children in elementary schools 55 and 121 so that they would attend junior high school at School 142, (2) failed to locate the district office of Board 28 at School 142, (3) neglected the physical plant, (4) failed to appoint a permanent principal for the school from 1970 to approximately 1978, and (5) failed to implement various suggestions brought to them, such as making School 142 a "magnet" school, affiliating with York College, getting monies to con-

tinue an aviation program, and locating the Townsend Harris program at the school.

## IV

As noted, the court certified the class on whose behalf this case is brought as consisting of "students" both black and Hispanic who would have attended School 142 but for its closing. Some of the testimony on behalf of plaintiffs concerned the adverse effect of the school's closing on the adults in the "community." However, the complaint asserts the students' interests. Therefore the primary concern must be on the nature, quality, and accessibility of the education they are afforded, although they too have an interest in the "community" in which they live.

## V

Under the applicable decisions plaintiffs must prove racially discriminatory intent in order to show a violation of the Equal Protection Clause. *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977); *Parent Ass'n of Andrew Jackson High School v. Ambach,* 598 F.2d 705, 712–13 (2d Cir.1979), and cases cited. Of course, it would be rare to discover an outright admission of the requisite invidious intent, and the court must examine all of the facts together in order to determine whether defendants acted with deliberate racially discriminatory purpose. Intent is a fact, which, like any other fact, may be established by circumstantial evidence. *Id. See also Brody-Jones v. Macchiarolo,* 503 F.Supp. 1185, 1238–39 (E.D.N.Y.1979); *cf. McCray v. Abrams,* 576 F.Supp. 1244 (E.D.N.Y.1983), *aff'd in part and vacated in part on other grounds,* 750 F.2d 1113 (2d Cir.1984), *petition for cert. pending,* 53 U.S.L.W. 3671 (U.S. March 4, 1985) (No. 84–1426).

Thus, the issue before this court is not whether, looked at in isolation, the act of closing the school was intentionally discriminatory. That closing was rational given the decrease in student population and the consequent diminution in the scope and quality of the school's educational offerings. The court finds that defendants did not for invidious reasons deliberately starve the academic program. It suffered because the number of pupils enrolled became insufficient to enable the school to maintain courses it had previously offered. By the time the school closed there was good reason to believe that the students would be better served from an academic standpoint at School 8 than they were then being served at School 142.

The critical issue is thus a broader one. It is whether commencing in 1970 the defendants acted with intent to discriminate against the students on racial grounds with knowledge that their actions would decrease the numbers attending the school and lead to its closing, in short whether, in plaintiffs' words, defendants "planned and created" the "death" of the school "in part, if not in whole" for racial reasons.

### A.

The initial and determining causes for the loss of student population to the extent that School 142's academic offerings suffered were rezonings in about 1970 of students out of the school, the opening in about 1972 of a new junior high school in District 28, somewhat later the opening of a new junior high school in District 27 which drew from School 142's feeder schools, and the later general decline in students throughout the city. The court does not find a racial purpose in the rezonings and openings. They were initiated in order to alleviate overcrowding, as plaintiffs admit. There is no contemporary evidence of what the defendants did or said from which the court can infer an improper motive. The Superintendent, who took office in 1974 and presumably was supported by the District 28 Board, opposed the change in the feeder pattern brought about by the opening of the new school in District 27. District 28 could not have prevented District 27 from opening that school or the allocation of students to it and there is no evidence from which the court can infer

that the Chancellor acted with racially discriminatory intent.

The record does not support a finding that any of the defendants or their predecessors rezoned students or opened new schools not for the purpose of relieving overcrowding but, foreseeing declining general enrollment, with the invidious intent to discriminate against the black students of School 142 by creating a condition that a decade or more later would lead to its closing.

B.

There is no doubt that some students while in elementary schools that fed School 142 chose to exercise an option available under the City Board integration policy to attend other elementary schools in order to obtain an integrated education. They then proceeded not to School 142 but to a junior high school fed by the elementary school they attended. Plaintiffs admit that in each year the numbers who exercised this option appeared to be relatively modest. Perhaps some thirty five a year did so between 1974 and 1978. Thereafter, because of lack of space, practically no students had the option. But to some moderate extent the integration policy of the City Board caused fewer students to attend School 142.

Plaintiffs attack the City Board's integration policy. They say that it is a racial policy with an overwhelmingly disparate impact on blacks, that under it the movement is almost exclusively of black students to white schools to the advantage of very few blacks because the City Board regards as integrated only schools fifty percent or more white and the city wide student body is about eighty percent black, and that the policy drains, in numbers and academic programs, schools such as School 142 that would have received the students had they not had the option.

Plaintiffs argue in short that the integration policy produced no significant positive results while having an adverse effect on black schools such as School 142.

The Court of Appeals for the Second Circuit has dealt with this integration policy in *Parent Ass'n of Andrew Jackson High School v. Ambach,* 598 F.2d 705 (2d Cir.1979) and 738 F.2d 574 (2d Cir.1984). That policy is, as the Court of Appeals has recognized, race conscious and therefore suspect under the Equal Protection Clause. Indeed, Judge Dooling of this court determined that the goal of that policy, and of the plan then before the court, by limiting minority students' access to schools because of their minority status in order to provide integrated schooling for as long as possible to an increasingly limited number of minority and other students, was unconstitutional because it led to the creation of a dual school system of integrated and segregated schools. *Parent Ass'n of Andrew Jackson High School v. Ambach,* 451 F.Supp. 1056, 1080–81 (E.D.N.Y.1978). The Court of Appeals did not accept Judge Dooling's view and held that the goal of ensuring relatively integrated schools for the maximum number of students, even at the cost of limiting freedom of choice for some minority students, survived the strict scrutiny that the Equal Protection Clause required. 598 F.2d at 717–720; 738 F.2d at 579.

The Court of Appeals accepted the probability of "white flight," though based on "ugly" fears, as a factor that the City Board could take into account in seeking to afford an opportunity for an integrated education to as many students as possible. 598 F.2d at 720. The court thus recognized as valid the proposition that when minority students comprise some substantial percentage of the population of a school the phenomenon of white flight will occur and what was formerly an integrated school will rapidly cease to remain such. The record before this court does not justify the rejection by this court of that factual proposition accepted by the Court of Appeals. Nor is it open to this court to strike a balance of the conflicting interests different from that made by the Court of Appeals.

The City Board urged in that case that the "tipping point" at which white flight

will take place was when the minority students became more than fifty percent of the population of a school. Twice the court has remanded for further proof to justify this view. But the presupposition of both opinions of the Court of Appeals was that at some point tipping would occur, perhaps, as the expert of plaintiffs in that case apparently suggested, only when the minority population of a school reached sixty percent.

The doubt which the Court of Appeals had was not to the validity of the basic policy of achieving integration at some expense to other values. The doubt was only as to the degree to which the freedom of students to attend schools other than those in their neighborhood had been limited by establishing as a "tipping point" too low a percentage of minority students in a receiving school. Plainly the higher the percentage of minority members a receiving school accepts the greater will be the drain on the number of students from the schools that those students have opted to leave. Thus, for example, had the City Board fixed sixty percent minority students as the tipping point, School 142 would have lost even more than the few students it did lose.

In weighing the competing considerations under the Equal Protection Clause the opinions of the Court of Appeals in the *Andrew Jackson* case did not address explicitly the adverse consequences that the integration policy may have had on the population and the academic programs of the schools the students abandoned or later failed to attend. But this court is not at liberty to reexamine the holding of constitutional validity of that policy on the supposition that the Court of Appeals gave no thought to those consequences. Particularly is this so in this case where the serious underpopulation of School 142 and thus its eventual closing would have occurred in the absence of the exercise of integration options.

Plaintiffs object both to the closing of School 142 and to the wholesale assignment of the students to School 8. It is unclear whether plaintiffs contend that, even if the

action closing the school was valid, they deem the assignment unconstitutional. They mention in their papers that the students should be permitted to attend any school they choose. To the extent that such a choice is inconsistent with the integration policy, the remarks already made apply. Aside from that policy there was nothing racially conscious about the assignment to School 8 once School 142 was closed.

C.

Plaintiffs point to another factor that they contend contributed to the underutilization of School 142, namely, the grant of variances to students in the School to attend other schools for various reasons personal to the students and to attend "special progress" classes. The school granted only very few such variances a year. There is no showing that the District 28 Board allowed these based on a desire to discriminate on racial grounds or to hasten the closing of School 142 because it was largely black.

Only three to five students a year received variances for personal reasons. The testimony by a parent that a guidance counselor had encouraged her not to enroll her child in School 142 but to seek out a "better" school did not establish racially discriminatory intent. The witness did not testify that the counselor said or did anything that revealed such an intent. The evidence does not justify an inference that the counselor had in mind anything other than the welfare of the child.

Because of the decline in school population and the absence of enough eligible students to fulfill the mandated register School 142 abandoned in 1977 "special progress" classes for students who were two years ahead in reading and one and a half years ahead in mathematics. Students meeting the qualifications were then allowed to apply to attend schools that had such programs. About ten School 142 students a year took advantage of this opportunity in 1977 and 1978. Thereafter, due to lack of space, the students no longer could

apply. There is no basis for finding that District 28 permitted the "special progress" applications for invidious reasons.

## VII

Plaintiffs contend that for racially discriminatory reasons defendants failed to act when presented with opportunities to increase enrollment in the school and to enrich its academic programs.

### A.

Plaintiffs say that the Superintendent and the District 28 Board opposed a 1978 proposal by District 27 to rezone students in elementary schools 55 and 121 so that they would feed into schools in District 28. Plaintiffs contend that this opposition was racially motivated in that the Superintendent and the Board pandered to the desire of white parents in Schools 55 and 121 to avoid feeding their children into a school more heavily black than the one they would otherwise attend. The City Board's Office of Zoning and Integration recommended rejection of District 27's proposal because it would have had a segregative effect on the graduates of schools 55 and 121. The Chancellor disapproved the proposal. The City Board and the State Commissioner of Education upheld the Chancellor's decision on the ground, among others, that the proposed rezoning rather than promoting integration would have had the opposite effect. This court has no basis for questioning that conclusion.

Plaintiffs contend the integration policy is invalid on the same grounds they express in urging that the allowance of integration options was improper. For reasons already stated the *Andrew Jackson* case is conclusive, and therefore this court holds that the rejection of the proposal by the Chancellor and the City Board, though race conscious, was not invidious.

Plaintiffs urge that because the District 28 Board and the Superintendent opposed a proposal that would have alleviated School 142's critical problem, namely, declining enrollment, the court should infer that they were motivated by racial considerations. Plaintiffs cannot show, and in any event the court does not find, that the support of District 28 would have persuaded the Chancellor, the City Board, and the State Commissioner to reach a different decision. But plaintiffs argue that in any event the attitude that the District 28 Board and the Superintendent took is probative of an intent to discriminate against the black students in School 142 at other times and in other ways.

It is difficult to measure the extent to which the opposition by District 28 to the proposal was based on a factor that the Court of Appeals has found legitimate, that is, the desire to foster integration for the greatest number for the longest possible time. In a brief filed with the City Board the District 28 Board's attorney urged that the Chancellor's decision rejecting the proposal be upheld on the ground, among others, that the reassignment of the pupils of Schools 55 and 121 would have an adverse effect on the opportunity for those students to receive an integrated education. But the primary responsibility of the District 28 Board was to the students of that district, and adoption of the proposal would have addressed to some extent the critical utilization problem that School 142 faced.

If the District 28 Board was actuated by the legitimate desire to maintain the greatest degree of integration for the longest period of time, this court, under the Court of Appeals decisions, could not find it improper. But if District 28 merely pandered to parents reluctant to feed relatively few white students from the District 27 schools into a predominantly black school that would be impermissible motivation in 1978. This court would have to consider it as part of the general mosaic in which School 142 took its earlier actions.

As stated above, the factors that had the determining eventual effect on the loss of enrollment in School 142 were the rezonings and the openings of new schools early in the 1970's and the general decline in school enrollment throughout the district and the city. In those early 1970's the

actions of the Board members in approving rezonings and a new school appeared to have been taken for the legitimate object of coping with overcrowding. The composition of the District 28 Board was different in the early seventies than it was in 1978. It would therefore be unjustifiable retroactively to attribute to the earlier Board members improper motives because, at least in part, the motives of the Board in 1978 in opposing the proposal of District 27 may have been impermissible. *Cf. Dayton Board of Education v. Brinkman*, 433 U.S. 406, 413–14, 97 S.Ct. 2766, 2772, 53 L.Ed.2d 851 (1977); *Parent Ass'n of Andrew Jackson High School v. Ambach, supra*, 598 F.2d at 709. The court has no basis for finding that the Board members in the early 1970's had any particular gift for prophecy, and the immediate objective to relieve overcrowding was evidently so legitimate as to be generally acknowledged.

### B.

Plaintiffs claim that the decision of the Board of District 28 to move the district office in 1980 from one location to another within Forest Hills rather than placing it in School 142 revealed an improper racial motive that reflects on the Board's earlier actions. While a move of the district office to the school might have served to enhance, at least temporarily, the school's image, it plainly would not have addressed the school's critical need for additional students. By occupying significant space the location of the district office perhaps would have inhibited growth of the student body.

To some extent the failure to place the district office at School 142 may have been based on an improper and unwarranted fear in 1980 of entering the neighborhood at night. But for reasons already stated, that fact does not warrant an inference that earlier decisions that decisively contributed along with declining city and district enrollment to the underpopulation were made with improper motives.

### C.

Plaintiffs note that the physical plant deteriorated over the years. But they did not show that this was significant in causing a lack of enrollment. Moreover, the proof did not show that School 142 received at the hands of District 28 a disproportionately low allocation of money with which to maintain the school and its programs. In fact over the years the District 28 Board allocated to School 142 funds beyond those to which it would have been entitled on a per capita basis. The deterioration of the physical plant thus appears to have been the result of rather than the cause of the underpopulation.

### D.

Plaintiffs suggest that the failure for a period of years to appoint a permanent principal for School 142 shows that defendants discriminated against it for racial reasons. Apparently the school had a series of acting principals from 1970 until about 1978. There is nothing in the record to explain why this occurred or to show whether a similar condition existed at other schools in District 28. A shifting administration undoubtedly was detrimental to the school, but it can hardly have contributed in any substantial way to the serious underutilization that was the basis of the school's chief difficulties.

### E.

The record does not support the accusation that the District 28 Board did nothing to address the problem of student enrollment. Perhaps the board could have done more, and certainly its efforts did not bear substantial fruit. Moreover, some efforts were frustrated by circumstances plainly beyond the school's control, such as the city budget reductions of 1975, and there was inevitably more talk than action.

The court has considered the evidence as to each of the proposals advanced for increasing utilization of the school and the testimony of the Superintendent as to the actions taken to try to implement those proposals. Maybe defendants could have

---

**1513**

taken more effective steps. But the evidence does not justify an inference that the defendants failed to do so with the racial motive to bring about the closing of a black school.

## VIII

The record in this case reveals one small part of a tragedy, the closing of a school in a thriving community. But under existing decisions this court can order remedial action only if the closing resulted from discrimination by officials on the basis of race or color in violation of federal law. The record does not justify such a finding. The officials acted to alleviate overcrowding when they initiated in the early 1970's the rezonings and school openings that were, along with a general decline in the city's school population, the critical reason for the school's later loss of enrollment. There is nothing in the record to suggest that in those early 1970's the forseeable impact would be the closing of a black school. Nor does the record support a finding that any or all of the other and later factors had a significant effect in causing the school to close. All of those other factors together are wholly insufficient to warrant an inference that in earlier years the officials rezoned or opened schools with intent to close a black school or with consciousness that such a result would follow. *Cf. Hart v. Community School Board*, 512 F.2d 37, 46, 51 (2d Cir.1975).

Several witnesses testified that in the city school system it was probable that the more able students were applying for various reasons to go to schools outside their neighborhood. Neighborhood schools thus felt a drain not just in numbers but in student ability. An important aspect of a pupil's education is the stimulation and example of other pupils. A school that loses student talent gives, to that extent, a less desirable education. A logical educational policy would seem to require a corresponding increase in effort in other ways to compensate for the loss of that talent. Otherwise a few pupils receive advantages at the expense of the many. There is no

showing that the Chancellor and the City Board made studies of this or developed facts to reveal the scope of the problem for a school like School 142.

The integration policy is admittedly race conscious, and one of the conditions for its approval would seem to be an affirmative effort to mitigate the loss to the black schools of numbers and talent. *Cf. Local Union No. 35 of the International Brotherhood of Electrical Workers v. Hartford*, 625 F.2d 416, 421 (2d Cir.1980), *cert. denied*, 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981). As noted above, the Court of Appeals has upheld the integration policy after weighing what it considered the relevant conflicting interests, and it is not for this court to conclude in this case that the Court of Appeals did not strike the proper balance. In any event, the critical causes leading to the eventual closing of School 142 were not the various options allowed to students but the rezonings and school openings of the early 1970's and the general decline in school enrollment.

The foregoing constitutes the court's findings of fact and conclusions of law.

The complaint is dismissed. So ordered.